**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WILLERT HOME PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20-cv-01151-MTS |
| | ) | |
| DRIVELINE RETAIL MERCHANDISING, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff, Willert Home Products, Inc. ("Willert") brought suit against Defendant, Driveline Retail Merchandising, Inc. ("Driveline"), alleging a claim of tortious interference and seeking a declaratory judgment that (1) Driveline failed to perform the services the parties' contract obligated it to perform and (2) that Willert does not owe the amounts Driveline claims Willert owes. *See generally* Doc. [24]. Driveline countersued alleging that Willert breached the parties' contract when it failed to pay Driveline's invoices. Doc. [5] ¶¶ 51–55; *see also* Doc. [26] at 1 n.1. Each side now has moved for summary judgment under Federal Rule of Civil Procedure 56. Willert seeks summary judgment on its count for declaratory judgment and on Driveline's counterclaim for breach of contract; Willert does not seek summary judgment on its tortious interference claim. Doc. [45]. Driveline seeks complete summary judgment on its counterclaim and both Willert's claims. Doc. [52]. For the reasons discussed herein, the Court will grant Driveline's motion and award it summary judgment on all claims in this case. Because the Court concludes Driveline is entitled to summary judgment in full, Willert's motion necessarily will be denied.

## I.        Standard

The standards applicable to summary judgment motions are well settled, and they do not change when both parties have moved for summary judgment.  *See Tower Rock Stone Co. v. Quarry & Allied Workers Loc. No. 830*, 918 F. Supp. 2d 902, 905 (E.D. Mo. 2013) (citing *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).  The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine dispute of material fact exists and whether the movant is entitled to judgment as a matter of law.  *Husinga v. Federal-Mogul Ignition Co.*, 519 F. Supp. 2d 929, 942 (S.D. Iowa 2007).  "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager*, 716 F.2d at 1214.

In this case, one procedural note on summary judgment merits mention before the Court begins its analysis.  The Local Rules of this District require each party opposing summary

judgment to file a Response to Statement of Material Facts that "must set forth each relevant fact as to which the party contends a genuine issue exists," which must include "specific citation(s) to the record." L.R. 4.01(E). The Local Rule explains that "[a]ll matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." *Id.* In Willert's responses to numerous paragraphs in Driveline's Statement of Uncontroverted Material Facts, Willert did not controvert Driveline's facts, specifically or otherwise. *See generally* Doc. [76]. Instead of admitting or denying many of Driveline's properly cited facts, Willert repeatedly pronounced them immaterial but did not deny their accuracy. Accordingly, the Court deems those facts Willert failed to specifically controvert as admitted for purposes of Driveline's Motion.[1] L.R. 4.01(E); *see also, e.g.*, *DaPron v. Spire, Inc. Ret. Plans Comm.*, 377 F. Supp. 3d 946, 950 (E.D. Mo. 2019) (finding objections plaintiff raised "that d[id] not cite to the record" were "ineffective for purposes of establishing a genuine factual dispute"), *aff'd*, 963 F.3d 836 (8th Cir. 2020); *Leonard v. St. Charles Cty.*, --- F. Supp. 3d ---, No. 4:19-cv-00927-MTS, 2021 WL 5161731, at *3 n.1 (E.D. Mo. Nov. 5, 2021).

## II.    Background

Willert manufactures several different household goods that are available for purchase at various stores. Among those stores are Dollar General Corporation's ("Dollar General") stores. While not a party to this suit, Dollar General's sale of Willert's products is at the heart of this action. At its stores, Dollar General uses Driveline's "retail merchandising services," which

[1] Of course, if Willert indeed was correct that the facts were immaterial, deeming them admitted should have no effect on the Court's summary judgment ruling. *See* Fed. R. Civ. P. 56(a). Nevertheless, Willert should have admitted or properly denied the facts, along with objecting to their materiality, so that the Court could determine what genuine issues exist. Its failure to do so unnecessarily muddied the water. One particularly remarkable example is that Willert declined to admit (or deny) that it "manufactures and distributes household goods that are sold at various retail outlets." Doc. [76] ¶ 17; *but see* Doc. [24] ¶ 5 (Willert alleging it "manufactures household goods that are sold at various retail outlets.").

consist of, among other things, setting and changing shelves into different displays based on planograms.[2]  This dispute arises out of a "Bakeware-Kitchen-Laundry Reset" where Dollar General used Driveline to implement—or reset—new planograms in a specific section of its housewares department in its stores.  Some of Willert's products were within some of the new planograms in this Bakeware-Kitchen-Laundry Reset.

In line with Dollar General's general practice, Driveline contracted directly with Willert through a Statement of Work ("SoW") for Willert to pay its "[f]airshare" of this reset.  Doc. [62-5] at 46–47.  The four-page SoW details the "Merchandising Services" that Driveline would perform in the housewares department of 15,999 Dollar General stores over ten business days. At each store, Driveline would: (1) "[l]ocate [the] fulfillment kit containing [planogram] materials and fixtures," (2) "[g]ive discontinued product to [a] manager" or "place [it] in [the] stockroom," (3) "[c]omplete reset by following the new planogram(s)," and (4) "[s]earch for and place new product found in or near the Hold for Driveline area."  *Id.* at 46.

The SoW provided a "Fee Summary."  *Id.* at 47.  Driveline wrote that it would take it 1.5 to 8.75 hours to complete the reset in each individual store.  *Id.*  It thus pegged the "Total Program Hours" of the reset to be 112,691, which would be subject to an hourly billing rate of $22.  *Id.*  Critically, the SoW noted that Willert's "Fairshare %" of this Bakeware-Kitchen-Laundry Reset was "9.90%."  *Id.*  That created an "Estimated LABOR COST based on Fairshare %" of $245,441.00.[3]  *Id.*  The Fee Summary also called for a "Minimum Trip Fee" of $11.50 "Per Store" and showed it also was subject to Willert's "Fairshare %" of 9.90%.  *Id.*  This fee applied if Driveline was prevented from executing the project at the time of the store's

---

[2] Planograms are schematics or detailed maps of products on a salesfloor.  They determine and show where to place the specific pieces of merchandise or items for sale in a store.

[3] A simple check of the arithmetic shows that this amount ($245,441.00) is 9.9% of the Bill Rate of $22 multiplied by the 112,691 Total Program Hours ($22 x 112,691 x .099 = $245,441.00).

scheduled visit.  The Fee Summary projected an "Estimated MINIMUM TRIP FEE COST based on Fairshare %" of $3,642.97.  *Id.*  The "Estimated LABOR COST based on Fairshare %" and the "Estimated MINIMUM TRIP FEE COST based on Fairshare %" added up to an "Estimated TOTAL PROGRAM COST based on Fairshare %" of $249,083.97.  *Id.*

| Number of Stores | Time Per Store | Total Program Hours | Bill Rate | Flat Rate Or Hourly | Fairshare % | Estimated LABOR COST based on Fairshare % | Estimated MINIMUM TRIP FEE COST based on Fairshare % | Estimated TOTAL PROGRAM COST based on Fairshare % |
|---|---|---|---|---|---|---|---|---|
| 15,999 | 1.5 Hours – 8.75 Hours | 112,691 | $22.00 | Hourly | 9.90% | $245,441.00 | $3,642.97 | $249,083.97 |

**From the "Fee Summary" of the Statement of Work, Doc. [62-5] at 47.**

After Driveline completed the Total Program, it calculated the actual Total Program Hours it took to complete the reset in all the stores.  Driveline neither tracked nor calculated the amount of time it spent solely on Willert during its work on the entire reset.  Rather, based on the Total Program Hours and Willert's previously designated "Fairshare %," Driveline submitted two Customer Invoices to Willert.  The first invoice, dated December 10, 2019, noted it was a Partial Invoice based on Driveline's work at 15,491 stores and totaled $237,604.01.  Doc. [62-6] at 34.  The second Customer Invoice, dated February 14, 2020, was for another 555 stores and also included Minimum Store Trip Charges for a total of $9,478.26.  Doc. [62-6] at 37.  In total, Driveline invoiced Willert for $247,082.27,[4] a sum less than the estimated Total Program Cost noted in the SoW.  But Willert never paid.  It became aware that less than sixty percent of the Dollar General stores that Driveline visited during the Bakeware-Kitchen-Laundry Reset actually had Willert's three new items.  Thus, while Driveline did visit all the locations and completed the reset as detailed by the planograms, it only placed Willert's products in about sixty percent of the stores it visited.

---

[4] Under the SoW, invoices were "due 15 days from the date of invoice," and "[p]ayments made more than 30 days past due date are subject to a late fee of 1.5% per month."  Doc. [62-5] at 48.

- 5 -

Willert refused to pay the invoiced amount.  It maintained that it was liable only for the hours that Driveline spent on Willert-specific tasks and not the "Fairshare %" of the Total Program.  When Willert refused to pay the invoices in full, Driveline informed multiple individuals at Dollar General about the situation and discussed it with them.  Internal emails show Driveline's employees discussing that they were going to make Dollar General aware that Willert was "not willing to pay" and that instead Willert counteroffered to pay a lesser amount. Doc. [76-4] at 2–3.  In one internal correspondence, Driveline noted that informing Dollar General about Willert's refusal to pay may allow Dollar General to "light a fire under" Willert. *Id.*  In other instances, Driveline asked for Dollar General's "assistance" in the matter, Doc. [78-2] at 2, and inquired whether Dollar General would "be able to offer any communication to [Willert] to pay [its] bill as noted," Doc. [78-3] at 2.  In another example, after Willert already had filed this suit, Driveline's Chief Executive Officer specifically warned Willert that Driveline would "involve all the appropriate parties at [Dollar General]."  Doc. [76-14] at 2.  Driveline further noted that involving Dollar General would "not [be] good for either" Willert or Driveline but that Willert left Driveline "no other option."  *Id.*

III.    **Discussion**

     **a.  Breach of Contract**[5]

Breach of Contract under Missouri[6] law requires four elements: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract;

---

[5] Willert seeks a declaratory judgment that Driveline failed to perform "the services it was obligated to perform under" the SoW and that Willert "does not owe the amounts Driveline is claiming are owed" because Driveline "failed to comply" with the SoW.  Doc. [24] ¶ 18.  Driveline countersued and asserted a breach of contract claim. Analysis of either claim requires analyzing whether a breach of contract occurred.

[6] Normally, when deciding which state's law to apply, federal courts exercising diversity jurisdiction, like here, "apply the forum state's choice-of-law principles" to determine what substantive law the forum would apply. *Simmons Foods, Inc. v. Indus. Risk Insurers*, 863 F.3d 792, 797 (8th Cir. 2017).  But, here, since neither side contends the law of a state other than Missouri applies to this case, Missouri law applies "by default" because it is the forum state. *BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003); *accord Progressive N. Ins. Co.*

- 6 -

(3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010). Here, the parties agree that the SoW at issue is an unambiguous contract. *See* Doc. [75] at 1. And, factually speaking, they even agree on what services Driveline actually performed. That is, there is no factual dispute around what actions Driveline did or did not take. Instead, the parties disagree on whether Driveline's actions constituted performance pursuant to the contract. *See* Doc. [5] ¶¶ 52, 55; Doc. [24] ¶ 15. Thus, the question is one purely of law. *See NTD I, LLC v. Alliant Asset Mgmt. Co., LLC*, 362 F. Supp. 3d 664, 675 (E.D. Mo. 2019) (citing *Brittany Sobery Family Ltd. P'ship v. Coinmach Corp.*, 392 S.W.3d 46, 50 (Mo. Ct. App. 2013)). The Court concludes that a plain reading of the unambiguous SoW shows Driveline's actions, which are not in dispute, constituted complete performance pursuant to the contract.

Willert argues that this case "turns on the straightforward interpretation of an unambiguous contract, whereby [Driveline] agreed to place three of [Willert's] products in 15,999 stores across the country." Doc. [46] at 1. Although Willert is correct that Driveline did not place Willert's three new items in several thousand of those 15,999 stores, Willert fundamentally mischaracterizes the agreement because the SoW simply did not require Driveline to place three of Willert's products at 15,999 Dollar General stores. Rather, the SoW unambiguously required that at all 15,999 Dollar General stores Driveline would provide four enumerated "Merchandising Services"—locate fulfilment kits containing planogram materials and fixtures, pull discontinued products, implement the new planogram layout(s), and search for and place new product it found in or near the "Hold for Driveline" area. Doc. [62-5] at 46.

---

*v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010). *See also, e.g.*, Doc. [74] at 3, 12 (Driveline asserting its counterclaim and Willert's tortious interference claim are "governed by Missouri substantive law"); Doc. [24] (Willert's Amended Complaint silent on which state's substantive law applies).

Willert has provided no evidence whatsoever that Driveline failed to do any of these four Merchandising Services at any Dollar General store.

Rather, Willert mistakes Driveline's requirement to "follow[] the new planogram(s)" and to "[s]earch for and place new product in or near the Hold for Driveline area" of the stores as a requirement that Driveline indeed actually place Willert's products in each and every store. The plain text—and common sense—obviously dictate that Driveline could not have placed new product on the shelves that was not at the store, that was not "in or near the Hold for Driveline area." *See* Doc. [62-5] at 46. That conclusion becomes all the more plain considering the SoW specifically notes that "[a]ny product not located at time of reset will be the store's responsibility to place." *Id.*

Willert does not argue that Driveline failed to visit every store it said it did. Indeed, Willert's Chief Financial Officer noted he was "certain" Driveline visited all the stores that the statement of work required Driveline to visit. Doc. [76-4] at 4. Nor has Willert provided any evidence that Driveline failed to "[s]earch for" new Willert product "in or near the Hold for Driveline area" at any of those stores. And Willert has not pointed the Court to any evidence whatsoever that even suggests that Driveline failed to "follow[] the new planogram(s)" or place Willert's products on the shelves in the stores where "new product[s were] found in or near the Hold for Driveline area."

Dollar General—for whatever reason and irrelevant to this case—chose *not* to have the Willert products at issue within the new planograms of certain stores. That choice is of no consequence to Driveline and also, of course, was outside Driveline's control. The SoW required Driveline to place the product that *was* at the stores onto the shelves and fixtures as the

planograms directed.  There is no record evidence that Driveline failed to do that.[7]  The SoW did not require that Driveline somehow inexplicably place product that was not even there onto the shelves or place items on the shelves that were *not* on a specific store's planograms.  Nothing in the record shows that Driveline failed to perform any service it "was obligated to perform under" the SoW or that it did not "comply" with the SoW.  Driveline therefore is entitled to summary judgment on Willert's count seeking a declaratory judgment.  *See* Doc. [24] ¶ 18.

Because a contract existed and Driveline performed pursuant to the contract, Willert breached the contract when it refused to pay Driveline as it had agreed to do.[8]  Thus, all that remains for Driveline to succeed on its breach of contract claim is to show that Willert's breach damaged it, and the breach plainly did.  It is undisputed that Willert has paid Driveline nothing whatsoever—let alone the entire amount due under their contract.  Driveline therefore is entitled to collect damages.  *See Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 533 (Mo. Ct. App. 2008) ("In an action for breach of contract, a plaintiff may recover the benefit of his or her bargain as well as damages naturally and proximately caused by the breach and damages that could have been reasonably contemplated by the defendant at the time of the agreement."); *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. Ct. App. 2008) ("A plaintiff claiming a breach of contract has available and need not choose between three types of damages—actual, consequential, and benefit-of-the-bargain[.]").  Driveline seeks the total amount it invoiced, $247,081, along with late fees of 1.5% per month.  Doc. [52] ¶ 4.  The Court finds the contract, the SoW, supports this measure of damages and that the amount will make Driveline whole but not make it "whole more than once."  *See Catroppa*, 267 S.W.3d at 818.

---

[7] In fact, undisputed evidence in the record confirms that Willert's products were *not* available in a significant number of Dollar General stores.  *See, e.g.*, Doc. [62-5] at 1.  That is, undisputed evidence in the record confirms that Driveline could not possibly have placed Willert's products on the shelves of those stores.

[8] Doc. [62-5] at 49 ("Driveline . . . agrees to provide the Services, at the locations, at the time, and for the prices set forth above, and [Willert] agrees to purchase and pay for such Services at such prices per above invoicing terms.").

In the SoW, Willert agreed to pay for Driveline's services "at such prices per [the SoW's] invoicing terms." Doc. [62-5] at 49.  The Fee Summary within the SoW provides how Driveline would (and did) charge Willert.  Driveline would visit 15,999 stores.  At each store, it would spend at least 1.5 hours but no more than 8.75 hours and charge an hourly bill rate of $22 per hour.  In the event Driveline went to one of the stores and could not perform the work because of a store issue, Driveline would charge an $11.50 Minimum Trip Fee.  For both the Total Program Hours and the Minimum Trip Fee, Willert would be responsible not for the entire amount but rather only a "Fairshare %" of 9.90%.  If that were somehow unclear, Driveline provided helpful estimation.  If the "Total Program Hours" were 112,691 then the "Estimated LABOR COST based on Fairshare %" would be $245,441.00.[9]  When you add into that total the "Estimated MINIMUM TRIP FEE COST based on Fairshare %" of $3,642.97, it equals the "Estimated TOTAL PROGRAM COST based on Fairshare %" of $249,083.97.  Simple arithmetic shows that the Total Program cost, under this *estimation*, would be $2,515,999.70, and Willert would owe 9.90% of that amount, which is $249,083.97.

Reading the fee summary makes it perfectly clear: Willert agreed to pay a "Fairshare %" of the cost of a "Total Program."  Unsatisfied with the harmonized reading of the Fee Summary, Willert strains to put forward its own interpretation where it contorts the "Fairshare %" into an estimation. *See, e.g.*, Doc. [46] at 7 (claiming "Driveline indicated . . . services for Willert would *likely* account for 9.9% of the estimated time-per-store." (emphasis added)); *id.* at n.4 (providing an equation with a "9.9% estimated share"); *id.* at n.5 (same); Doc. [83] at 3 (asserting that Driveline "provided an **estimate** . . . of the time it would spend on Willert-specific services by using the "Fairshare %"); *id.* (calling it "obvious" that the "Fairshare % is only related to the '**Estimated**' costs").  But nowhere does the SoW say that the "Fairshare %" is an estimate.

---

[9] (112,691 x $22) x 9.9% = $245,441.00

Rather, it flatly notes the "Fairshare %" is "9.90%," twice and without any qualification or proviso.  Willert's irregular reading would require the Court to insert the word *estimated* before "Fairshare %."  The Court cannot do that.  *The Renco Grp., Inc. v. Certain Underwriters at Lloyd's, London*, 362 S.W.3d 472, 479 (Mo. Ct. App. 2012) (noting that an "interpretation that inserts language into a contract is forbidden" and that courts cannot "insert provisions by judicial interpretation").  It would be especially inappropriate to do so in this contract because the SoW did note that some things *were* estimated, like the "Estimated LABOR COST" or the "Estimated TOTAL PROGRAM COST."  With the "Fairshare %" the SoW provides no such qualification.  *Cf. Perry State Bank v. Farmers All. Mut. Ins. Co.*, 953 S.W.2d 155, 159 (Mo. Ct. App. 1997) (Stith, J.) (presuming that where the same words are used in the same contract, they are intended to be used in the same sense).

And Willert's contrived reading that the "Fairshare %" was just an estimate falls apart completely when looking at the Minimum Trip Fee.  The SoW provides that Willert also will pay a 9.9% "Fairshare %" of the $11.50 Minimum Trip Fee each time Driveline was prevented "from executing th[e] project at the time of th[e] scheduled store visit."  Doc. [62-5] at 47.  If the "Fairshare %" was only "an **estimate** . . . of the time [Driveline] would spend on Willert-specific services," Doc. [83] at 3, Willert's identical "Fairshare %" of the $11.50 Minimum Trip Fee makes little—if any—sense.[10]  If this "Fairshare %," which the SoW never describes as an estimate, were indeed just an estimate of the time-per-store Driveline would spend on Willert-related activities, how would Driveline spend 9.9% of a minimum trip on Willert-specific services where it necessarily did not perform services at all?  In contract interpretation, a

---

[10] Willert incorrectly claims in one of its briefs that Driveline "admits" that "the 'Fairshare %' is used to provide estimates for Willert's total fee."  Doc. [83] at 6.  Willert cites to two paragraphs where Driveline admitted no such thing.  *Id.* (citing Doc. [81] ¶¶ 8, 9).  In reality, Driveline points out (in a paragraph of actual relevance to this point) that "there is nothing showing that the 9.90% 'Fairshare %' in the SOW is tied to hours estimated for Willert in any way."  Doc. [81] ¶ 10.  The Court agrees.

"construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003).

The unambiguous reading of the contract shows that Willert owes its "Fairshare %" of the Total Program Cost.  While the undisputed material facts show that Driveline was damaged, Driveline has not submitted an exact damages amount.  The contract provided that invoice "[p]ayments made more than 30 days past due date are subject to a late fee of 1.5% per month." Doc. [62-5] at 48.  In its Motion for Summary Judgement, Driveline seeks the amount it invoiced Willert "along with late fees of 1.5% per month."  Doc. [52] ¶ 4.  Driveline did not provide a computation of that total amount, and the Court will not calculate it in the first instance.  *See, e.g.*, *Cucu v. 861 Rest. Inc.*, No. 1:14-cv-1235-JGK, 2017 WL 2389694, at *6 (S.D.N.Y. June 1, 2017) (granting summary judgment but ordering briefing on damages calculations noting that such calculations are "best performed, in the first instance, by counsel").  Thus, the Court will order Driveline to submit briefing setting out the computation of damages for which it maintains Willert is liable.

**b.  Tortious Interference**

Driveline also seeks summary judgment on Willert's claim of tortious interference. Under Missouri law, a plaintiff must satisfy five elements in a cause of action sounding in tortious interference with a business relationship: (1) the plaintiff was involved in a valid business relationship; (2) the defendant was aware of that relationship; (3) the defendant intentionally interfered with that relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of the defendant's conduct.  *Hibbs v. Berger*, 430 S.W.3d 296, 318 (Mo. Ct. App. 2014).  Driveline asserts that Willert has no evidence to support that Driveline interfered with Willert's relationship with

Dollar General or that Willert suffered any damages.  Doc. [74] at 2.  Further, Driveline asserts that Willert cannot show the absence of justification if any of Driveline's actions constitute interference.  *Id.*

In the Amended Complaint, Willert identified its tortious interference claim as just that; it did not specify whether it was alleging tortious interference with contract or with business expectancy.  In its allegations, it did not specify any particular contract with Dollar General. Rather, it alleged Willert had "a valid and reasonable expectancy of a continued relationship with and ongoing sales and services to Dollar General." Doc. [24] ¶ 26.  Further, Willert has pointed to no evidence in the record of any specific contract between it and Dollar General, especially one Dollar General since has breached.   Accordingly, the Court analyzes this claim as interference with a business relationship.  This "distinction" matters because Missouri courts "afford greater protection for existing contracts than for business expectancies."   *Clinch v. Heartland Health*, 187 S.W.3d 10, 15 (Mo. Ct. App. 2006) (explaining a defendant "enjoys greater latitude to interfere" when the "alleged interference is with expectancy as opposed to an existing" contract); *see also Downey v. United Weatherproofing*, 253 S.W.2d 976, 981 (Mo. 1953) (noting "the right to the performance of an existing contract is a right to rely upon another's present commitment and consequently one of greater expectancy than is the right to enter into future contracts").

Here, the Court finds that even if Driveline's acts, as established by the uncontroverted facts, were interference under Missouri law, they were justified.  "The absence of justification" is defined as "the absence of any legal right to take the actions complained of."  *Taylor v. Zoltek Companies, Inc.*, 18 S.W.3d 541, 547 (Mo. Ct. App. 2000) (quoting *Eggleston v. Phillips*, 838 S.W.2d 80, 83 (Mo. Ct. App. 1992)).  "A defendant's interference can be justified on numerous grounds[.]"  *Clinch*, 187 S.W.3d at 16.  One of the numerous grounds Missouri law recognizes as

a justification is a "present existing economic interest." *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 192 (Mo. Ct. App. 2007). A party with such an interest, like "a prior contract of his own or a financial interest[,] . . . is privileged to interfere with another's business expectancy to protect one's own economic interest." *Id.* (citing *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990)); *see also Cent. Bank of Lake of the Ozarks v. Shackleford*, 896 S.W.2d 948, 956 (Mo. Ct. App. 1995) (explaining that a party "who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own economic interest"). Such was the case here.

Driveline had an economic interest because Willert did not pay Driveline for the services Driveline provided at Dollar General stores even though the parties' contract required Willert to pay. Driveline "was justified in attempting to enforce its rights under the [ ] agreement." *See Luketich v. Goedecke, Wood & Co.*, 835 S.W.2d 504, 508 (Mo. Ct. App. 1992). Even if the Court determined that Willert was correct and that Driveline over-invoiced Willert, Driveline plainly "had a reasonable, good faith belief in the validity of the agreement" such that Driveline had a right to seek to collect under the contract. *See id.* That conclusion is especially true in this case because Willert never disputed that Driveline performed at least some services for Willert. Nevertheless, Willert has paid Driveline nothing at all, even for the services that Willert long has acknowledged Driveline performed for it in thousands of Dollar General stores.[11]

Of course, though protecting one's economic interest constitutes justification for interference with a business expectancy, Driveline still could not have employed "improper

---

[11] In addition, Driveline had a contract with Dollar General that specifically provided that "in the event that a Vendor d[id] not pay" Driveline's invoices that Dollar General would assist Driveline to some degree. *See* Doc. [76] ¶ 205. In other words, Driveline had a prior contract with Dollar General that specifically contemplated Driveline informing Dollar General of delinquent vendors like Willert. *See Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. banc 1990) (explaining that someone with a "present existing economic interest" like "a prior contract of his own" is "privileged to interfere with another's business expectancy to protect one's own economic interests").

- 14 -

means" related to its efforts to collect from Willert. *Cent. Bank of Lake of the Ozarks*, 896 S.W.2d at 956; *Clinch*, 187 S.W.3d at 16–17. In this context, "improper means" are those wrongful acts "recognized by statute or the common law" that are "independently wrongful," like violence, trespass, or misrepresentation of fact. *Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 317 (Mo. banc 1993). Willert alleged that Driveline used improper acts, Doc. [24] ¶ 40 (alleging Driveline used "threats, defamation, and misrepresentation of facts"), but nothing in the record relating to Willert's communications with Dollar General or its employees even approaches actionable threats, defamation, or misrepresentation. Asking Dollar General for assistance, requesting Dollar General communicate with Willert about the debt, and stating that Driveline would involve all appropriate parties at Dollar General do not even approach improper, even when viewing the communications in the light most favorable to Willert.[12] Since Driveline had an interest in collecting on the services it performed for Willert at Dollar General's stores, and because Driveline did not use improper means when it involved Dollar General in the parties' dispute, Willert's claim for tortious interference fails as a matter of law.

## CONCLUSION

The undisputed material facts in this case show that Driveline is entitled to judgment as a matter of law on its claim for breach of contract and on Willert's claims for tortious interference and for declaratory judgment. As noted in Section III.A., however, while undisputed material facts show that Driveline did suffer damages, it has not submitted to the Court an exact amount

---

[12] Willert makes much of the fact that one Dollar General employee offered to cut off Willert's account. *See* Doc. [76] at 124; *id.* ¶ 257. Even if such a request or demand *by Driveline* in this case would have amounted to unjustified interference, there is nothing in the record that shows that Driveline requested or demanded that the Dollar General employee "cut off" Willert's business with Dollar General—only that one Dollar General employee made the offer at one point. Indeed, Dollar General did *not* "cut off" Willert's business. And, even if Dollar General had chosen to sever its ties with Willert based on Willert's conduct, it does not follow that Driveline's truthful recount to Dollar General would have lacked justification simply because of how Dollar General reacted to the truthful information Driveline provided. *Cmty. Title*, 796 S.W.2d at 373 ("The mere fact that defendant's conduct may have had a negative effect on plaintiffs' business expectancies does not, *a fortiori*, establish an absence of justification.").

of damages or its damages computation.  No later than Wednesday, February 23, 2022, Driveline shall submit briefing setting out its computation of damages.  Willert may file a response no later than seven days after Driveline submits its briefing.  The Court then will issue a judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant/Counter-Plaintiff Driveline Retail Merchandising, Inc.'s Motion for Summary Judgment, Doc. [52], is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff/Counter-Defendant Willert Home Products, Inc.'s Motion for Summary Judgment, Doc. [45], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant/Counter-Plaintiff Driveline Retail Merchandising, Inc. shall submit its briefing on its damages computation, and Willert may file its response, consistent with this Memorandum and Order.

**IT IS FINALLY ORDERED** that the trial setting in this matter for March 21, 2022 is **VACATED**.

Dated this 17th day of February, 2022.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

- 16 -